UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :

                                                      :            14 Cr. 105 (MKB)

                  v.            :

                                                      :

JORGE ESTRADA-TEPAL, *et al.*            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MEMORANDUM OF LAW IN SUPPORT OF RICARDO ESTRADA-TEPAL'S MOTION TO SUPPRESS EVIDENCE AND DISMISS COUNTS

Matthew B. Keller, Esq.
Peter R. Ginsberg Law LLC
80 Pine Street,33rd Floor
New York, N.Y. 10004
(856) 553-5291
mkeller@kellerlawfirmny.com
*Attorney for Defendant*
*Ricardo Estrada-Tepal*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT

BACKGROUND ……………………………………………………………… 7

ARGUMENT ………………………………………………………………...10

I.      ALL ITEMS AND EVIDENCE SEIZED FROM
        MR. ESTRADA-TEPAL'S HOME MUST BE SUPPRESSED AS
        FRUITS OF AN UNLAWFUL WARRANTLESS SEARCH ..………………..10

        A.      Applicable Law ……………………………………………… 10
        B.      Mr. Estrada-Tepal Did Not Validly Consent to the Search ……………… 12

II.     MR. ESTRADA-TEPAL'S CUSTODIAL STATEMENTS MUST
        BE SUPPRESSED BECAUSE HE NEVER VALIDLY WAIVED
        HIS *MIRANDA* RIGHTS ……………………………………………… 14

        A.      Applicable Law ……………………………………………...14
        B.      Mr. Estrada-Tepal Did Not Voluntarily Waive *Miranda* With a
                "Full Awareness" of His Rights and the Consequences of Waiver……...… 15

III.    THE SEX TRAFFICKING COUNTS MUST BE DISMISSED
        BECAUSE THE STATUTES ARE UNCONSTITUTIONALLY OVERBROAD
        AND A SUBSTANTIAL NUMBER OF THEIR APPLICATIONS ARE
        UNCONSTITUTIONAL IN RELATION TO THE STATUTES'
        LEGITIMATE SWEEP ………………………………………………...  17

        A.      Mr. Estrada-Tepal Has Standing to Raise an Overbreadth Challenge Based On
                The Associational Rights Of Others …………………………………… 17
        B.      18 U.S.C. § 1591 Is Substantially Overbroad Because It Contains
                No Requirement That A Defendant Intend His Or Her Actions
                To Further The Crime Of Sex Trafficking…………………………………18
        C.      Section 1591 Prohibits Intimate And Expressive Association
                Protected By The First Amendment ……………………………….... 20

                1.      The intimate association prohibited by § 1591
                        triggers strict scrutiny…………………………………………… 22
                2.      The expressive association prohibited by §1591
                        triggers strict scrutiny ………………………………… 24
                3.      Section 1591 does not survive strict scrutiny …………………… 25

        D.      Section 1591 substantially infringes associational liberties and therefore
                may not be applied against Mr. Estrada-Tepal …………………………… 27

CONCLUSION ………………………………………………………………… 28

## TABLE OF AUTHORITIES

**Cases**

*Aptheker v. Secretary of State*, 378 U.S. 500 (1964) ................................................................ 25

*Berghuis v. Thompkins*, 560 U.S. 370 (2010) .............................................................. 13

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ........................................................ 16, 17

*Bumper v. North Carolina*, 391 U.S. 543  (1968) .................................................. 10, 11

*Campaneria v. Reid*, 891 F.2d 1014 (2d Cir. 1989) .................................................. 13

*Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of N.Y.*, 502 F.3d 136 (2d Cir. 2007)
................................................................................................................ 21, 22

*Citizens Against Rent Control/Coalition for Fair Hous. v. Berkeley*, 454 U.S. 290 (1981)........ 23

*Coates v. Cincinnati*, 402 U.S. 611 (1971) ................................................................ 17

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) .............................................................. 9

*Corso v. Fischer*, 11 Civ. 8602 (CS), 2013 U.S. Dist. LEXIS 152336 (S.D.N.Y. Oct. 22, 2013)
................................................................................................................ 22, 23, 24

*Falwell v. Miller*, 203 F. Supp. 2d 624 (W.D. Va. 2002) ............................................ 23

*Fare v. Michael C.*, 442 U.S. 707 (1979) ................................................................ 13

*Farrell v. Burke*, 449 F.3d 470 (2d Cir. 2006)............................................................ 16

*Finest Fighting, Inc. v. Bratton*, 95 F.3d 224 (2d Cir. 2007)........................................ 23

*Grayned v. City of Rockford*, 408 U.S. 108 (1972)............................................ 16, 25

*Griswold v. Connecticut*, 381 U.S. 479 (1965)............................................................ 22

*Hardt v. Reliance Std. Life Ins. Co.*, 560 U.S. 242 (2010)........................................ 18

*Kusper v. Pontikes*, 414 U.S. 51 (1973).................................................................................. 23

*Louisiana Debating & Literary Ass'n v. City of New Orleans*, 42 F.3d 1483 (5th Cir. 1995)..... 22

*Miranda v. Arizona*, 384 U.S. 436 (1966) ............................................................. 5, 13, 14, 15

*Moore v. East Cleveland*, 431 U.S. 494 (1977) .................................................................... 21

*Moran v. Burbine*, 475 U.S. 412 (1986) ............................................................................. 13

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ............................................................. passim

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ......................................................... 9, 10

*United States v. Bin Laden*, 132 F. Supp. 2d 168 (S.D.N.Y. 2001)...................................... 14

*United States v. Guzman*, 724 F. Supp. 2d 434 (S.D.N.Y. 2010) .................................... 10

*United States v. Jaswal*, 47 F.3d 539 (2d Cir. 1995) ...................................................... 13

*United States v. Kobel*, 389 U.S. 258 (1967).................................................................. 24

*United States v. Male Juvenile*, 121 F.3d 34 (2d Cir. 1997)........................................... 13

*United States v. Mangeri*, 451 F. Supp. 73 (S.D.N.Y. 1978) .......................................... 9

*United States v. Price*, 599 F.2d 494 (2d Cir. 1979)...................................................... 10

*United States v. Sanchez*, 635 F.2d 47 (2d Cir. 1980) ............................................. 9, 10, 12

*United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990) ..................................................... 13

*United States v. Wilson*, 11 F.3d 346 (2d. Cir. 1993) ............................................... 10, 11

*Zablocki v. Redhail*, 434 U.S. 374 (1978)........................................................................ 21

## Constitutional Provisions

U.S. Const. Amend. IV .................................................................................................... 9
U.S. Const. Amend. V ..................................................................................................... 13

Statutes

18 U.S.C. § 1591.................................................................................................................... passim
18 U.S.C. § 1594.................................................................................................................... 5, 16

## PRELIMINARY STATEMENT

Ricardo Estrada-Tepal stands accused of: (1) one count of sex trafficking conspiracy in violation of 18 U.S.C. § 1594 (Count One); (2) two counts of sex trafficking in violation of 18 U.S.C. § 1591 (Counts Three and Four); (3) conspiracy to transport illegal aliens in violation of 8 U.S.C. § 1324 (Count Five); and (4) transporting illegal aliens for financial gain in violation of 8 U.S.C. § 1324 (Count Six). Mr. Estrada-Tepal respectfully submits this memorandum of law in support of his motion: (1) to suppress all evidence obtained pursuant to a search of his home on January 30, 2014; (2) to suppress statements made by Mr. Estrada-Tepal to government agents on January 30, 2014; and (3) to dismiss Counts One, Three and Four of the Indictment. In the alternative, Mr. Estrada-Tepal requests a hearing on each of these issues.

First, the Court should suppress any items or data of evidentiary value seized from Mr. Estrada-Tepal's home as a result of the January 30, 2014, search by government agents. The government cannot demonstrate that Mr. Estrada-Tepal validly consented to the search in light of the totality of the circumstances surrounding the purported consent, including the significant show of force by the agents, their immediate placement of him in custody and their actions, which conveyed to Mr. Estrada-Tepal that they had authority to search whether or not they obtained his consent.

Second, the Court should suppress Mr. Estrada-Tepal's post-arrest statements because the government cannot meet its burden of persuasion that Mr. Estrada-Tepal voluntarily, knowingly and intelligently waived his *Miranda* rights. Under the totality of the circumstances, he cannot be found to have waived his rights with a full awareness of the nature of those rights and the consequences of a decision to abandon them.

Finally, because 18 U.S.C. 1591(a) is unconstitutionally overbroad, Mr. Estrada-Tepal seeks dismissal of Counts One, Three and Four of the Indictment. *See* Argument, Point III.

## BACKGROUND

Early in the morning of January 30, 2014, Defendant Ricardo Estrada-Tepal ("Ricardo")[1], still undressed from the previous night, heard a loud banging outside his front door. *See* Affidavit of Ricardo Estrada-Tepal, dated June 24, 2014 ("Affidavit") ¶ 4. Outside he heard loud male voices yelling in Spanish, Mr. Estrada-Tepal's native language and the only one he understands. *Id.* ¶ 2. The voices yelled that, if the door were not opened quickly, the men would break it down. *Id.* ¶ 4.

One of the tenants with whom Ricardo shared the small basement apartment at 104-47 38th Avenue in Queens, New York, went to the door and opened it. Five or six men dressed in body armor and wearing large belts laden with various tools and weapons moved into the small space. *Id.* ¶ 5. The agents separated the tenants, ordering Ricardo and his wife into the bedroom they shared in the rear of the apartment. *Id.* ¶ 7. In their bedroom, the men demanded that Ricardo and his wife show them identification. *Id.* Ricardo quickly complied, but his wife could not because she did not have ID. *Id.*

Ricardo was unclear as to who these men were. *Id.* ¶ 6. He had lived in New York long enough to know what local police officers looked like, and this team of unknown men did not appear to be the police that Ricardo was accustomed to seeing on the street. They appeared to him most like the Mexican federal police he knew from his native country. It also occurred to

---

[1] Because two of Mr. Estrada-Tepal's codefendants are his brothers sharing the same last name, to avoid confusion this memorandum refers to him by his first name.

him that they might be kidnappers, because in Mexico he had heard that kidnappers often dress like the "federales" when carrying out abductions.[2]

The men handcuffed Ricardo and his wife and took them to the kitchen where the other tenants had been gathered. *Id*. at ¶ 8. When one of the tenants, Don Rodrigo, attempted to ask one of the men who they were and why they were there, the man placed his finger to his lips, indicating that he and the others should be silent. *Id.* ¶ 9. As Ricardo sat in silence, he could hear the men in his bedroom. *Id.* ¶ 10.

At some point one of the men approached Ricardo and told him that he had to sign some papers. *Id.* ¶ 11. Ricardo could not understand the forms: he had never attended school, and the small amount of reading and writing he could perform was learned from his years working on construction sites. *Id.* ¶¶ 12-13. One of the men removed Ricardo's handcuffs and told him to put his name on the forms. *Id.* ¶ 14. On one of the forms, the man told him to write his address and to include the English word "basement." *Id.* ¶¶ 14-15. Ricardo did not know this word and, when he indicated that to the man, the man spelled it for him. *Id.* ¶ 15. On the other form, Ricardo was told to write his telephone number. *Id.* ¶ 14.

The agents then brought Ricardo back into his room and told him to get dressed. *Id.* ¶ 17. Ricardo saw that the agents had gone through many of his and his wife's possessions and had strewn them about the space. *Id.* ¶ 16. After he dressed, the men put handcuffs back on him,

---

[2] *See*, *e.g.*, Patrick Radden Keefe, *Cocaine Incorporated*, N.Y. Times (June 15, 2012) (quoting former employee of drug cartel as saying that "'everyone' in the organization had military and police identification" and that "[d]aylight killings are sometimes carried out by men dressed in police uniforms, and it is not always clear, after the fact, whether the perpetrators were thugs masquerading as policemen or actual policemen providing paid assistance to the thugs.") (*available at* www.nytimes.com/2012/06/17/magazine/how-a-mexican-drug-cartel-makes-its-billions.html?pagewanted=all&_r=0) (last visited June 24, 2014).

removed him from the home and placed him in an unmarked grey vehicle. *Id.* ¶ 17. Three of the men got in the car and they drove off.

While they were driving the men spoke to each other in English. Ricardo could not understand what they said. *Id.* ¶ 18. They arrived at a building and drove down into a parking lot beneath it. *Id.* ¶ 19. Ricardo was removed from the vehicle and taken to a room with many men similar in appearance to the ones who had taken him from his home. *Id.* Next they escorted him to a room with several jail cells. Ricardo did not know many of the men in the cells but recognized his brothers, codefendants Jorge and Victor Leonel Estrada-Tepal. *Id.*

Ricardo waited in the cell for about one-half hour before being taken to an interrogation room where two plainclothes agents waited. *Id.* ¶ 20. One of the agents addressed Ricardo by asking him if he knew "Bin Laden." *Id.* at 21. The question frightened Ricardo, who still had not been informed why he had been arrested. *Id.* ¶ 22. He began to wonder if, somehow, the authorities had mistakenly connected him with the most widely-known terrorist in the world. *Id.*

One of the agents produced a piece of paper and began reading it quickly. *Id.* ¶ 23. Although he read in Spanish, Ricardo could not follow what the man he was saying. He could see some of the paper as the agent read, and noticed a word he did know: "Inmigracion," in English, "Immigration." *Id.* ¶ 24. Ricardo asked whether his detention had to do with immigration, and he was told that he would be deported because he was not legally present in this country. *Id.*

The agent stopped reading, and told Ricardo to write his initials next to some of the lines of text on the form. *Id.* at 25. Ricardo did not recognize the word "initials," so the agent had to explain what it meant. As Ricardo negotiated this task, a third agent entered the room. This man was well-dressed. He spoke in English to the other agents and they all laughed. *Id.* ¶ 26. The

man then addressed himself to Ricardo and uttered a slang term which Ricardo understood as a racial epithet. The man then left the room. *Id.* The slur further upset Ricardo and enhanced his confusion at his situation. *Id.* ¶ 27.

One of the remaining agents then asked Ricardo to sign the bottom of the form. *Id.* ¶ 28.

## ARGUMENT

## I.

### ITEMS SEIZED FROM MR. ESTRADA-TEPAL'S HOME MUST BE SUPPRESSED AS FRUITS OF AN UNLAWFUL WARRANTLESS SEARCH

The Court should suppress any items or data of evidentiary value seized from Mr. Estrada-Tepal's home as a result of the January 30, 2014, search because the government cannot demonstrate that Mr. Estrada-Tepal validly consented to the search.

### A.  Applicable Law

The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV. "[T]the most basic constitutional rule . . . is that 'searches conducted outside the judicial process [i.e., without a warrant] . . . are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.'" *United States v. Mangeri*, 451 F. Supp. 73, 75-76 (S.D.N.Y. 1978) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (citations omitted in original). Those exceptions are "jealously and carefully drawn," and there must be "a showing by those who seek exemption . . .

that the exigencies of the situation made that course imperative." *Id.* (citations omitted); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

One of these exceptions is a search that has been consented to by the lawful occupant of premises. *United States v. Sanchez*, 635 F.2d 47, 58 (2d Cir. 1980). For consent to be valid, however, it must be "voluntarily and freely given" and not be "the product of duress or coercion, flagrant or subtle." *Id.* "Where there is coercion there cannot be consent." *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968).

To determine whether a consent to search is voluntary, courts looks to the totality of all the circumstances to determine whether the consent was "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Wilson*, 11 F.3d 346, 351 (2d. Cir. 1993) (quoting *Schneckloth*, 412 U.S. at 227). Relevant circumstances include, *inter alia*, "the age of the subject, his level of education and of intelligence, and whether he was deprived of food or sleep or subjected to other physical abuse," *Schneckloth*, 412 U.S. at 227, whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, whether the defendant previously had refused to consent," *United States v. Guzman*, 724 F. Supp. 2d 434, 441-42 (S.D.N.Y. 2010), as well as "subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Sanchez*, 635 F.2d at 58 (quoting *Schneckloth*, 412 U.S. at 229).

Courts should be "particularly sensitive to the heightened possibilities for coercion" when evaluating consent "given by a person in custody," *Schneckloth*, 412 U.S. at 240 n.29, and a permissive statement by a defendant cannot be deemed a voluntary consent if "law enforcement

agents have represented to the defendant that they have authority to search whether or not he consents." *Bumper*, 391 U.S. at 548-50.

The government bears the burden of proving that consent was freely and voluntarily given. *United States v. Price*, 599 F.2d 494, 503 (2d Cir. 1979).

B. **Mr. Estrada-Tepal Did Not Validly Consent to the Search**

Here, Ricardo did not voluntarily consent to the search of his apartment. The five or six agents in body armor who swarmed into his home early in the morning before Ricardo had dressed for the day undeniably constituted a significant show of force. Moreover, Ricardo was clearly in custody when he was asked to consent to a search. He was handcuffed soon after the agents entered the home, and was forced to sit in silence while agents went into his room, all prior to the request to consent. Crucially, the agents conveyed to Ricardo and the others their authority to search whether or not they obtained consent by securing the tenants in the kitchen while they entered Ricardo's bedroom and began making noise. When one of the tenants attempted to question one of the agents, the agent put his finger to his lips. This universal signal to keep quiet further indicated that the occupants, including Ricardo, had no say over a search that likely had already begun. *See Bumper*, 391 U.S. at 548-50.

Finally, Ricardo received no formal education growing up and, as a result, was unable to develop normal intelligence. He learned to read a little while working on various construction sites during the course of his adult life, but this paltry education left him at a significant disadvantage when he had to make decisions involving important legal rights during the high-stress search of his home on January 30.

Ricardo's case is similar to the defendant in *United States v. Wilson*, 11 F.3d 346 (2d Cir. 1993). There, a DEA task force gained entry to the defendant's apartment by knocking on the

door, identifying themselves as police officers and, according to the agents, requesting

permission to search.[3] *Id.* at 350. Applying the totality of the circumstances test, the Second

Circuit doubted whether the defendant "actually consented to this search," in light of his "limited

education and knowledge of the English language, coupled with the fact that he was not

informed of his right to refuse consent to the search," and "particularly in light of the intrusive

nature of the agents' entry into the apartment."[4] *Id.* at 351.

      Here, the totality of the circumstances weighs more heavily in favor of a lack of consent

than it did in *Wilson*. There the court was concerned because the defendant "had only a limited

working knowledge of English and a limited education, consisting of only two years of high

school in Colombia." *Id.* at 350. Here, in contrast, Ricardo understands little to no English and

had no formal education of any kind. Moreover, the defendant in *Wilson* was "fully dressed," *id.*,

when the agents knocked on his door; here, Ricardo was still undressed, increasing the

"vulnerable subjective state" he found himself in when the group of agents came pouring across

the threshold into his apartment. *Sanchez*, 635 F.2d at 58. Thus, as in *Wilson*, here the totality of

the circumstances indicates that Ricardo did not consent to the search.

      Accordingly, any evidence seized from the basement of 104-47 38th Avenue during

the unconstitutional search on January 30, 2014 must be suppressed.

---

[3] According to the defendant, the officers never requested consent to search but, rather, "pointed their guns at him," "placed him against the wall of the apartment, frisked him and proceeded to search the apartment, asking for consent only when they had nearly completed the search." *Id.* at 350.

[4] Ultimately the court declined to rule on the consent issue, resting its decision instead on the conclusion that admission of any evidence tainted by the likely unconstitutional search was harmless error. *Id.* at 351.

## II.
## MR. ESTRADA-TEPAL'S CUSTODIAL STATEMENTS MUST BE SUPPRESSED BECAUSE HE NEVER VALIDLY WAIVED HIS *MIRANDA* RIGHTS

The Court should suppress Mr. Estrada-Tepal's post-arrest statements because the government cannot establish that Mr. Estrada-Tepal voluntarily, knowingly and intelligently waived his rights to remain silent and to have counsel present during custodial interrogation.

### A.  Applicable Law

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that, "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id*. at 444. After a defendant has been advised of the *Miranda* warnings, "[t]he defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.* To be voluntary, a waiver must be, "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

To establish that a defendant validly waived his *Miranda* rights, the government bears the burden of proving, by a preponderance of the evidence, that: (1) the relinquishment of the defendant's rights was voluntary, and; (2) the defendant had a full awareness of the right being waived and of the consequences of waiving the right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran*, 475 U.S. 412); *see also Berghuis v. Thompkins*, 560 U.S. 370 (2010) (waiver effective if "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it") (quotations omitted).

14

As with the Fourth Amendment analysis, Point II, *supra*, the determination of whether a defendant has validly waived her *Miranda* rights depends upon the totality of the circumstances. *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979). Courts have considered factors such as the conduct of the police, the suspect's age, intelligence and education, *see United States v. Male Juvenile*, 121 F.3d 34, 40-41 (2d Cir. 1997), language barriers, *see Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989), and the suspect's prior experience with the criminal justice system, *see United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990).

### B. Mr. Estrada-Tepal Did Not Voluntarily Waive Miranda With a "Full Awareness" of His Rights and the Consequences of Waiver

Here, Ricardo cannot be said to have waived his *Miranda* rights with a full awareness of the nature of those rights and the consequences of a decision to abandon them. The salient factors above, individually and collectively, clearly played a role in this lack of awareness. The agent's quick reading of the *Miranda* rights, combined with Ricardo's low comprehension (largely due to his lack of education), likely rendered the reading of those rights an ineffective conveyance of their substance. The language barrier likely played a role as well: Ricardo describes the agents switching between Spanish and English several times during the interrogation. This would likely have kept Ricardo on edge, wondering what information he might be missing during the English conversations. Ricardo's lack of prior experience with the American – or any other – criminal justice system undoubtedly made the entire episode confusing and intimidating.

In addition to these factors, however, here the process by which the agents obtained a purported waiver from Ricardo included law enforcement practices tending to further obfuscate an effective communication of the *Miranda* rights at issue. Indeed, such psychological tactics, a hallmark of modern interrogation practice, drove the Supreme Court's reasoning in *Miranda*. *See*

*United States v. Bin Laden*, 132 F. Supp. 2d 168, 186 (S.D.N.Y. 2001) (noting that custodial interrogation, "in its modern American guise, is 'psychologically rather than physically oriented'") (quoting *Miranda*, 384 U.S. at 448). Modern interrogation strategies – such as thrusting the suspect "into an unfamiliar atmosphere" and running him through "menacing" procedures – made it "obvious" to the *Miranda* Court "that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner." *Id.* (quoting *Miranda*, 384 U.S. at 457).

The "psychological orientation" of Ricardo's interrogation is evident from the first question: one of the agents asked whether Ricardo knew "Bin Laden." Assuming this to be a reference to the former terrorist leader responsible for the September 11 attacks, any reasonable person might be expected to become distracted by such a question from federal agents during an interrogation whose purpose had hitherto been concealed from the suspect. Ricardo's affidavit states that, in fact, he was frightened by the question, asked shortly before the administration of *Miranda* warnings. Finally, the introduction of a third agent into the room at the crucial moment when Ricardo was told to place his initials beside the individual *Miranda* rights takes on added significance in light of that agent's making a racial insult directed towards Ricardo. This powerful psychological blow, delivered at a moment where a suspect should be thinking as clearly and rationally as they are able about their interests, further clouded the process of conveying to Ricardo the information he needed to execute a voluntary, knowing and intelligent waiver.

Accordingly, because Ricardo's *Miranda* waiver was made without "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," his post-arrest statements should be suppressed.

**III.**

**THE SEX TRAFFICKING COUNTS MUST BE DISMISSED BECAUSE THE STATUTES ARE UNCONSTITUTIONALLY OVERBROAD AND A SUBSTANTIAL NUMBER OF THEIR APPLICATIONS ARE UNCONSTITUTIONAL IN RELATION TO THE STATUTES' LEGITIMATE SWEEP**

18 U.S.C. § 1591 is unconstitutionally overbroad on its face because it significantly infringes upon the right to free association guaranteed by the First Amendment to the United States Constitution. This requires dismissing Counts One, Three and Four of the Indictment against Mr. Estrada-Tepal. Counts Three and Four charge Mr. Estrada-Tepal with violating § 1591, "sex trafficking," and Count I charges him with violating § 1594(c), "conspiracy to commit sex trafficking" as that offense is defined in § 1591. Because the statute would operate to prohibit a substantial amount of intimate association between family members and expressive association on the part of individual and groups that support women engaged in sex trafficking, it is unconstitutional and cannot be applied to Mr. Estrada-Tepal.

**A. Mr. Estrada-Tepal Has Standing to Raise an Overbreadth Challenge Based On The Associational Rights Of Others**

An overbreadth challenge is always facial. *See United States v. Stevens*, 559 U.S. 460, 473 (2010). Such a challenge is an "exception to the general rule against third party standing," which typically prohibits challenging a statute beyond its application to the conduct charged against a particular defendant. *See Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006) (citing *Broadrick v. Oklahoma*, 413 U.S. 601 (1973)). "A party alleging overbreadth claims that although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them." *Farrell*, 449 F.3d at 498. This exception to standing is based on "a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech

or expression." *Broadrick*, 413 U.S. at 612; *see also Grayned v. City of Rockford*, 408 U.S. 108, 114 (1972) ("Because overbroad laws . . . deter privileged activity, our cases firmly establish appellant's standing to raise an overbreadth challenge."). Therefore, a statute may be invalidated in all its applications if a, "substantial number of its application are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (quotation marks omitted).

Overbreadth challenges are permitted when "rights of association [are] ensnared in statutes which, by their broad sweep, might result in burdening innocent associations." *Broadrick*, 413 U.S. at 612 (listing cases). The Supreme Court has delineated two distinct forms of constitutionally protected association: "intimate association" and "expressive association." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). Explaining the difference between these two forms of association, the Court stated:

> In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

*Id.* at 617-18.

18 U.S.C. § 1591 substantially interferes with both types of associational freedoms and, accordingly, the statute may not be applied to Mr. Estrada-Tepal. *See Coates v. Cincinnati*, 402 U.S. 611, 619-20 (1971) ("Although a statute may be neither vague, overbroad, nor otherwise invalid as applied to the conduct charged against a particular defendant, he is permitted to raise

its vagueness or unconstitutional overbreadth as applied to others. And if the law is found

deficient in one of these respects, it may not be applied to him either, until and unless a

satisfactory limiting construction is placed on the statute.").

**B. 28 U.S.C. § 1591 Is Substantially Overbroad Because It Contains No Requirement That A Defendant Intend His Or Her Actions To Further The Crime Of Sex Trafficking**

"The first step in overbreadth analysis is to construe the challenged statute." *Stevens*, 559

U.S. at 474. In Stevens, the Supreme Court considered the constitutionality of 18 U.S.C. § 48,

which provided for criminal penalties for "the commercial creation, sale, or possession of certain

depictions of animal cruelty." *Id*. at 464. Affirming the Third Circuit, the Court held that,

because § 48 was not limited to a subset of "extreme animal cruelty" as the government

proposed, it was "substantially overbroad, and therefore invalid under the First Amendment." *Id*.

at 482.

Similarly, here § 1591 is a "criminal prohibition of alarming breadth." *Id.* at 474. The

statute provides in relevant part:

> (a) Whoever knowingly— (1) in or affecting interstate or foreign commerce, or
> within the special maritime and territorial jurisdiction of the United States,
> recruits, entices, harbors, transports, provides, obtains, or maintains by any means
> a person; or (2) benefits, financially or by receiving anything or value, from
> participation in a venture which has engage in an act described in violation of
> paragraph (1), knowing, or in reckless disregard of the fact, that means of force,
> threats of force, fraud, coercion . . . , or any combination of such means will be
> used to cause the person to engage in a commercial sex act . . . , or that the person
> has not attained the age of 18 years and will be caused to engage in a commercial
> sex act, shall be punished as provided in subsection (b).

When construing a statute, courts must analyze statutory language on the assumption that

"the ordinary meaning of that language accurately expresses the legislative purpose." *Hardt v.*

*Reliance Std. Life Ins. Co.*, 560 U.S. 242, 251 (2010) (quotation marks omitted). In addition,

courts "must enforce plain and unambiguous statutory language according to its terms." *Id*.

(citations omitted). What is striking about the language of § 1591 is the lack of a necessary criminal purpose connected to many of the associational actions it prohibits. Indeed, the text nowhere requires that any of the prohibited actions actually further sex trafficking. Rather, all that the statute requires is knowledge that one is engaging in one of the eight prohibited actions, and knowledge (or reckless disregard) that the object of those actions will engage in underage or coerced commercial sex. Regardless of the intention behind any of these actions, the statute on its face criminalizes such actions as the provision of housing ("harboring"), transportation ("transporting"), or food or clothing ("maintaining by any means") to someone the actor knows to be an underage or coerced prostitute, regardless of any involvement in a sex trafficking scheme. None of these words suggests that the statute is limited to the furthering of sex trafficking.

Moreover, no such limitation can be inferred. Even if some of the prohibited actions suggest a connection to an enterprise (*i.e.*, "recruit," "entice," "provide," and "obtain"), the remaining three actions do not. *Cf. Stevens*, 559 U.S. at 474 (noting the statutory language "'Maimed, mutilated, and tortured' convey cruelty, but `wounded' or 'killed'" do not) (alterations omitted). As in *Stevens*, the canon of *noscitur a sociis* [5] has no application where, as here, the other actions proscribed by § 1591 ("harbor," "transport," "maintain") are unambiguous and therefore must be read "according to their ordinary meaning." *Id.* at 474.

These terms have ordinary and unambiguous meanings. "Harbor" means "to give shelter to (someone) : to hide and protect (someone)."[6] "Transport" means "to carry (someone or

---

[5] "[A]n ambiguous term may be given more precise content by the neighboring words with which it is associated." *Id*. at 474 (internal quotations and citation omitted).

[6] Online Merriam-Webster Dictionary (*available at* www.merriam-webster.com/dictionary).

something) from one place to another." *Id.* "Maintain" means "to support or provide for" (as in "has a family to maintain") or to "sustain" (as in "enough food to maintain life"). *Id.*

**C.  Section 1591 Prohibits Intimate And Expressive Association Protected By The First Amendment**

Section 1591, by prohibiting the housing, transportation, clothing, and feeding of known sex workers, captures within its reach a broad swath of activities protected under the First Amendment. These activities fall under the category of intimate association ("choices to enter into and maintain certain intimate human relationships"), expressive association (association "for the purpose of engaging in those activities protected by the First Amendment –speech, assembly, petition for the redress of grievances, and the exercise of religion"), or both. *See Roberts*, 468 U.S. at 609, 617-18 ("In particular, when the State interferes with individuals' selection of those with whom they wish to join in a common endeavor, freedom of association in both its forms may be implicated.").

The protected associations at issue here are those between family members and other intimate associations. The ban on harboring prohibits cohabitation of family members when one or more members know that another member is an underage or coerced sex worker. The ban on maintaining prohibits even more intimate association, sweeping into the proscription not just the provision of necessities such as food and clothing, but also much what makes up familial life, such as shared finances and property. The ban on transportation captures a similarly broad category of interaction between people who cohabit or otherwise share their lives with family or close friends.

Section 1591 also intrudes upon non-familial associations. Its prohibitions reach the activities of shelters, as well as other support organizations and individuals that seek to provide support to sex workers. If, in the context of providing services to a known sex worker, the

organization or a member thereof gains knowledge that a recipient of services is currently an underage or coerced sex worker, that group or individual falls within the statute if they nonetheless seek or continue to provide that person with temporary housing and other maintenance, such as food, clothing and medical treatment. Such organizations are often rooted in religious, political, or social beliefs that are protected under the First Amendment.[7]

1.    The intimate association prohibited by § 1591 triggers strict scrutiny

The degree of protection afforded to a personal relationship is not fixed, but rather requires a "careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Roberts*, 468 U.S. at 620. Determining whether a challenged law impermissibly infringes upon the freedom of association requires courts to balance the individual's interest in resisting government interference with the government's justification for that interference. *See Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of N.Y.*, 502 F.3d 136, 143 (2d Cir. 2007). In striking this balance, courts must consider: (1) the strength of the associational interests asserted and their importance to those whose rights are infringed; (2) the degree to which the rule interferes with those interests; (3) the public interests or policies served by the rule imposed; and (4) the tailoring of the rule to effectuate those interest or policies. *Id.* The more important the associational interest asserted, and the more the challenged governmental rule burdens the associational freedom, the more persuasive must be the state's reasons for the intrusion, and the more precisely tailored the state's policy must be. *Id.*

_____

[7] For example, Girls Educational and Mentoring Services (GEMS), provides a wide variety of services, including housing and legal assistance, to sex workers. *See* www.gems-girls.org/about (GEMS is "one of the largest providers of services to commercially sexually exploited and domestically trafficked youth in the US").

With respect to the types of associational interests accorded strict scrutiny, the Supreme Court has afforded the most protection to close familial relationships, such as those between spouses and relatives. *See Zablocki v. Redhail*, 434 U.S. 374, 383 (1978) (substantial interference with right to marry warrants strict scrutiny); *Moore v. East Cleveland*, 431 U.S. 494, 500 (1977) (striking down under strict scrutiny review ordinance restricting ability of family members to cohabit). In order to survive strict scrutiny, the government must justify interference in these relationships with "sufficiently important state interests" and means that are "closely tailored to effectuate only those interests." *Zablocki*, 434 U.S. at 388. There is nothing in the language of § 1591 that attempts to exclude close relations from knowingly assisting a trafficked family member for any reason.

Strict scrutiny also applies to § 1591 to the extent the statute prohibits associations in the context of relationships that, while not within a family, share similar qualities of "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Roberts*, 468 U.S. at 620; *Chi Iota*, 502 F.3d at 145 ("[T]he [Supreme] Court has declined to restrict the right to intimate association to the family context"). Thus, courts have extended strict scrutiny to a range of relationships from unmarried couples who share children in common, *see Corso v. Fischer*, 11 Civ. 8602 (CS), 2013 U.S. Dist. LEXIS 152336 (S.D.N.Y. Oct. 22, 2013) (applying strict scrutiny in the context of former spouses whose children maintained close relationships with each other), to social clubs, *see Louisiana Debating & Literary Ass'n v. City of New Orleans*, 42 F.3d 1483, 1497-98 (5th Cir. 1995) (applying strict scrutiny to state regulation of social clubs which were "[r]elatively small in size, [ ] seek to maintain an atmosphere in which their members can enjoy the comradery and congeniality of one another" and "seek to remain isolated" through "very

restrictive guest and admission policies"). Since § 1951 prohibits a substantial number of these associations, the statute must survive strict scrutiny to pass constitutional muster.

2.   The expressive association prohibited by §1591 triggers strict scrutiny

Expressive association involves association in pursuit of "a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts*, 468 U.S. at 622 (citing cases); *see also Griswold v. Connecticut*, 381 U.S. 479, 483 (1965) ("[W]e have protected forms of 'association' that are not political in the customary sense but pertain to the social, legal, and economic benefit of the members."); *Finest Fighting, Inc. v. Bratton*, 95 F.3d 224, 227 (2d Cir. 2007) (describing the "kinds of activities that are traditionally associated with the First Amendment" as "civic, charitable, lobbying, or fundraising activities").

"[A] significant encroachment upon associational freedom cannot be justified upon a mere showing of a legitimate state interest." *Kusper v. Pontikes*, 414 U.S. 51, 58 (1973). Rather, to overcome the protection accorded such association, a government infringement must "serve compelling state interest, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623.

The association of women's shelters with sex workers is decidedly expressive—it conveys a commitment to advancing the welfare of women in the most concrete terms, by providing women with housing and other means of support. The encroachment on that association by § 1591 is significant. It prevents such organizations and individuals from providing the very services that define their existence, to the very people they seek to engage. Thus, § 1591 significantly encroaches on expressive association and triggers "exacting judicial review." *Citizens Against Rent Control/Coalition for Fair Hous. v. Berkeley*, 454 U.S. 290, 294 (1981).

24

3.  <u>Section 1591 does not survive strict scrutiny</u>

"Strict scrutiny is usually the `death knell' for the challenged regulation." *Corso*, 2013 U.S. Dist.
LEXIS 152336 at *9 (quoting *Falwell v. Miller*, 203 F. Supp. 2d 624, 631 (W.D. Va. 2002)). "If
the state has open to it a less drastic way of satisfying its legitimate interests, it may not choose a
legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Kusper*,
414 U.S. at 59.

Here, there is no doubt that Congress had legitimate and important interests in punishing
those who traffic in commercial sex by the underage and the unwilling. Yet, despite the worthy
end – and perhaps because of it – the statute is not narrowly drawn. Because the statute requires
no actual involvement in sex trafficking at all, and attaches liability to simple knowledge (or
reckless disregard) that force, fraud or coercion will be used (by anyone), the statute reaches far
beyond those responsible for forced or underage commercial sex. "The statute quite literally
establishes guilt by association alone . . . . [and t]he inhibiting effect on the exercise of First
Amendment rights is clear." *United States v. Kobel*, 389 U.S. 258, 265 (1967) (holding that
broad provision exposing Communist Party members in defense industry was not narrowly
tailored); *see also Corso*, 2013 U.S. Dist. LEXIS 152336 at *10 (prison regulation prohibiting
contact between guards and inmates or parolees was not narrowly tailored despite state's
obviously weighty interest in prison security).

Here, § 1591 forces individuals to choose to either refrain from fundamental associations
with their loved ones involved in sex trafficking or to face criminal liability. Similarly, it forces
charitable institutions to either forego an essential part of their espoused mission or to face such
liability. *See Kobel*, 389 U.S. at 265; *Corso*, 2013 U.S. Dist. LEXIS 152336 at *10. The statutory
text makes no distinction between conduct which actually furthers its legitimate end of

eradicating coerced and underage commercial sex, and conduct which does not. In fact, a plain reading of the statute criminalizes many activities which almost certainly assist sex trafficking victims. Thus, § 1591 "amounts to use of a blunt axe when a scalpel is called for." *Corso*, 2013 U.S. Dist. LEXIS 152336 at *9. It is for Congress, not the courts, to less drastically satisfy its legitimate interests by, say, amending the statute to include as an element of the offense an intent to further sex trafficking. *See Stevens*, 559 U.S. at 481 ("This Court may impose a limited construction on a statute only if it is readily susceptible to such a construction. We will not rewrite a law to conform it to constitutional requirements.") (citations and quotations omitted); *Aptheker v. Secretary of State*, 378 U.S. 500, 515 (1964) ("this Court will not consider the abstract question of whether Congress might have enacted a valid statute but instead must ask whether the statute that Congress did enact will permissibly bear a construction rendering it free from constitutional defects"). Where a statute is clear and precise, as here, courts may not "proceeds on a case-by-case basis to separate out constitutional from unconstitutional areas of coverage." *Id.* at 516; *see also Kobel*, 389 U.S. at 267 ("The task of writing legislation which will stay within the [bounds imposed by the Constitution] has been committed to Congress.")

The Government may argue that the Court can rely on executive discretion to keep enforcement within reasonable bounds. But "the First Amendment protects against the Government; it does not leave us at the mercy of nobles oblige." *Stevens*, 559 U.S. at 480. The overbreadth doctrine exists to prevent the chilling of constitutionally protective association, *see*, *e.g.*, *Grayned*, 408 U.S. at 114, and such a concern cannot be addressed by government assurances of limited enforcement. Section 1591 plainly prohibits anyone, including family members and shelters, from providing housing, transportation, food, clothing, and medical treatment to anyone whom that person knows to be an underage or coerced sex worker. As such,

it is not narrowly tailored to meet the government's legitimate interests and cannot survive strict scrutiny.

> D. **Section 1591 substantially infringes associational liberties and therefore may not be applied against Mr. Estrada-Tepal**

In the context of an overbreadth challenge, the Supreme Court has further imposed the requirement that a challenged statute's overbreadth must be "substantial . . . judged in relation to [its] plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (internal quotations omitted). As the foregoing demonstrates, § 1591's encroachment on protected associations is vast. Many sex workers have families who care for them and would seek to assist them whether or not they continued to be trafficked. Under the plain terms of § 1591, none of those family members may provide that person with housing, transportation, food, clothing, or medical treatment if they are aware that their loved one engages in sex for money while underage or under duress. The father who knows his 16 year-old daughter is a sex worker, but does not want to throw her out of the house is in violation of § 1591. The sister who may disapprove of her brother's sex work violates the section if she supports her brother with food and clothing in the hope that they will soon stop.

On the organizational level, any shelter which knowingly provides housing and support for current underage or coerced sex workers is likewise in violation of § 1591. For that matter, there is nothing in the text of the statute foreclosing liability – where the knowledge requirement is met – against hospitals, counseling services and soup kitchens. One such organization, GEMS, lists 42 partner organizations that provide services to sex workers in 21 states and the District of Columbia. *See* GEMS, Service Providers by State, *available at* www.gems-girls.org/what-we-do/service-providers-by-state.

Accordingly, § 1591 is substantial overbroad and, as a result, the statute may not be enforced against Mr. Estrada-Tepal.

27

## CONCLUSION

Because of the illegal actions of law enforcement in this case, both physical and

electronic evidence and statements purportedly made by Mr. Estrada-Tepal must be suppressed.

Because 18 U.S.C. § 1591 is substantially overbroad, Counts One, Three and Four of the

Indictment must be dismissed.

Dated:         New York, New York
               June 24, 2014

                                          By:_____s/_____
                                          Matthew B. Keller
                                          Of Counsel
                                          Peter R. Ginsberg Law LLC
                                          80 Pine Street, 33rd Floor
                                          New York, N.Y. 10005
                                          (646) 374 – 0026
                                          mkeller@prglaw.com