UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA        :
                                :    14 Cr. 105 (MKB)
        v.                      :
                                :
JORGE ESTRADA-TEPAL, *et al*.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### REPLY MEMORANDUM OF LAW IN SUPPORT OF RICARDO ESTRADA-TEPAL'S MOTION TO SUPPRESS EVIDENCE AND DISMISS COUNTS

Defendant Ricardo Estrada-Tepal ("Ricardo") respectfully submits this reply in support of his Motion To Suppress Evidence And Dismiss Counts (Dkt. # 37).

### I.

### THE AGENTS NEVER OBTAINED VALID CONSENT TO SEARCH RICARDO'S HOME

Ricardo did not validly consent to the search of his home in the basement of 104-47 38th Avenue. *See* Memo. of Law In Support of Ricardo Estrada-Tepal's Motion To Suppress Evidence and Dismiss Counts ("Ricardo Mot.") at 10-13. Using a previously withheld consent form, the Government's primary response is that Ricardo's consent was irrelevant because Ricardo's wife, identified as "Jane Doe 3" in the Indictment, gave written consent approximately one-half hour before Ricardo was asked to consent to the search. *See* Memo. of Law In Response to Defendants Pre-Trial Motions ("Opp.") at 20-21. This argument fails for two reasons. First, Jane Doe 3 executed the consent to search under many of the same coercive conditions as Ricardo: following a significant show of force by the agents and after being handcuffed. Second, the disparate treatment of Jane Doe 3 and Ricardo – she was asked to execute the consent form prior to the search of Ricardo's bedroom while Ricardo was asked for consent after the search

was substantially complete – raises additional questions to which the Government has not provided a response. Accordingly, the Government has not met its burden of establishing consent.

### A. Law of Third-Party Consent

Warrantless searches are *per se* unreasonable under the Fourth Amendment. *See United States v. Lopez*, 547 F.3d 397, 399 (2d Cir. 2008) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). A warrantless search may be performed following voluntary consent from "a person with 'common authority' over the area to be searched." *Id.* at 399 (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). However, the Government bears the burden of demonstrating that consent was voluntary, whether it relies on consent by the defendant or a third party. *See United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981) ("To satisfy the burdens imposed on it by the third party consent principle, the Government must show, by a preponderance of the evidence, that the consent to search was freely and voluntarily given") (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)); *see also United States v. Matlock*, 415 U.S. 164, 177-78 (1974). While officers are normally not required to obtain consent from all co-occupants after receiving consent of one co-occupant, "the police must not have removed the occupant for the purpose of avoiding a possible objection." *Lopez*, 547 F.3d at 400 (citing *Georgia v. Randolph*, 547 U. S. 103, 121 (2006)).

### B. The Government Has Not Established that Jane Doe 3's Consent Was Valid or Sufficient to Justify the Warrantless Search of Ricardo's Apartment

The Government has failed to establish that Jane Doe 3's consent was freely and voluntarily given because Jane Doe 3 executed the consent to search under many of the same circumstances present when Ricardo executed the consent form. Both Ricardo and his wife were

2

in their bedroom early in the morning when a group of armed agents in body armor entered their apartment. *See* Affidavit of Ricardo Estrada-Tepal, dated June 24, 2014 ("Affidavit") ¶ 5; Opp. at 10-11. The agents handcuffed both Ricardo and his wife, and demanded identification from them. Affidavit ¶ 8; Opp. at 11. Under interrogation by the agents, both Ricardo and his wife allegedly admitted that they were illegally present in the United States. Opp. at 11.

Indeed, the risk of duress or coercion may well have been greater in the case of Jane Doe 3. She was asked to consent shortly after admitting that she was illegally present in the United States, and she was alone with at least two agents in the bedroom while they searched her room; Ricardo was detained with his co-tenants in another room. Opp. at 12. Accordingly, the Government has not established that, under the totality of the circumstances, Jane Doe's consent was "voluntarily and freely given" as opposed to "the product of duress or coercion, flagrant or subtle." *United States v. Sanchez*, 635 F.2d 47, 58 (2d Cir. 1980).

Moreover, the circumstances here suggest that the agents may have separated Ricardo and his wife "for the purpose of avoiding a possible objection" by Ricardo. *Lopez*, 547 F.3d at 399 (citing *Randolph*, 547 U. S. at 121). The Government nowhere accounts for the reasons for the half-hour lapse between when Jane Doe 3 and Ricardo were asked to give written consent to a search of the apartment. Nor does the Government explain why Jane Doe 3 was asked to consent prior to the search – and was permitted to remain in the bedroom during the search – while Ricardo was kept out of the bedroom and asked for consent only after the bedroom had been searched. These discrepancies are notable because, even in the Government's telling, Ricardo and his wife were similarly situated: both Ricardo and Jane Doe 3 were discovered in their bedroom after agents knocked on the bedroom door. The agents then demanded

identification from and handcuffed them both. Opp. at 11. Under interrogation by the agents, both Ricardo and Jane Doe 3 allegedly admitted they were in the United States illegally. *Id.*

For unexplained reasons, the agents next purportedly obtained consent from Jane Doe 3 and searched Ricardo's bedroom in Jane Doe 3's presence. *Id* at 12. In contrast, Ricardo was not asked to consent prior to the search and was kept outside of the bedroom with the other tenants during the search. *Id.* In addition, the Government does not explain why, unlike Ricardo, Jane Doe 3 was not asked to "specifically describe the premises to be searched" on her consent form. Opp. at 12 n.8.

Accordingly, the Government has not established that Jane Doe 3 freely and voluntarily consented to the search of Ricardo's bedroom.

### C. The Government Has Not Established That Ricardo Validly Consented to the Search of His Apartment

As set forth in Ricardo's motion, his execution of the consent to search does not justify the HSI agents' warrantless search of his apartment under the totality of the circumstances. *See* Ricardo Mot. at 12-13. Because the Government admits that agents performed a thorough search of Ricardo's bedroom prior to seeking his consent, *see* Opp. at 12, all fruits of that search must be suppressed. Moreover, the agents made a significant show of force throughout their presence in the apartment, they placed Ricardo and the others in handcuffs, and they forced Ricardo and his co-tenants to sit silently while agents searched his room.[1]

---

[1] At least one of the agents effectively communicated authority to search regardless of consent when the agent placed a finger over his lips in response to questions from one of Ricardo's co-tenants. Affidavit ¶ 9. The Government cavalierly dismisses the notion that this could have deprived Ricardo of an ability to challenge the agents' authority. *See* Opp. at 23-24. Respectfully, the Government underestimates the effect of such a universal and unequivocal signal to refrain from speaking issued, as here, by an armed Government agent in body armor standing in one's living room.

4

The Government relies on several distinguishable cases in support of its argument that voluntary consent is "routinely" found where a defendant is in the presence of multiple law enforcement officers and has been handcuffed. *See* Opp. at 22. In *United States v. Moreno*, 701 F.3d 64 (2d Cir. 2012), the Second Circuit upheld the district court's finding, following a suppression hearing, that the defendant had voluntarily consented to a search of her hotel room. Unlike the situation faced by Ricardo, there the agents obtained the defendant's consent prior to beginning their search. *Id*. at 68-69. Moreover, the defendant was handcuffed in response to her own potentially threatening actions: when she attempted to close the door on one agent, the agent blocked the door, grabbed the defendant's wrist when she resisted and, with the assistance of a second agent, subdued and handcuffed the defendant. *Id.* Here, there is no indication that any of the tenants behaved at any time in a manner that threatened the agents.

Similarly, in *United States v. Crespo*, 834 F.2d 267 (2d Cir. 1987), the district court found, following a suppression hearing, that agents had reasonably entered the defendant's apartment in hot pursuit [2] where the agents had the "immediate right to arrest" the defendant after hearing him threaten a cooperating witness just prior to their entry into the defendant's apartment. The Second Circuit upheld the agents' entry, and the defendant's subsequent consent to a search of his apartment, based upon the district court's finding that the defendant "was a 'highly intelligent person and a professional in the trade,' who, therefore, would realize that failure to give consent would merely delay the search for an hour or so." *Id.* at 272. In contrast, Ricardo lacks any formal education and has no prior experience with the criminal justice system.

---

[2] In *Crespo*, the district court found that the agents' "display of weapons, together with the agents' kicking the door, caused the door to be opened by threat of force and not with consent." *Id.* at 269.

5

In *United States v. Ansaldi*, 372 F.3d 118 (2d Cir. 2004), the Second Circuit upheld a consent search where evidence at the suppression hearing tended to show that that the defendant, after being arrested, handcuffed and Mirandized outside his home, agreed with the agents' suggestion that they enter his home to provide pedigree information. Once inside the house, the defendant orally consented to a search before the agents searched the house. *Id.* at 129-30. Here, Ricardo was not asked to consent prior to the search of his bedroom; nor was he given *Miranda* warnings prior to being asked to consent to the search.

*United States v. Kon Yu-Leung*, 910 F.2d 33 (2d Cir. 1990), is particularly inapposite. There, the Second Circuit reversed the district court's suppression of evidence seized from defendant's home on *Sixth* Amendment grounds.[3] *Id.* at 40. The district court had found after a suppression hearing that six DEA agents in civilian clothes had arrested the defendant in his home pursuant to a warrant. *Id.* at 35. Prior to seeking the defendant's consent to search the house, the agents administered *Miranda* warnings. *Id.* Following a discussion with his wife, the defendant executed a consent form that advised him of the "constitutional rights to (1) refuse such consent, (2) to require that a search warrant be obtained prior to any search, (3) that if I do consent to a search, any evidence found as a result of such search, can and will be used against me in any civil or criminal proceedings, (4) that I may consult with an attorney of my choosing before or during the search and (5) that I may withdraw my consent to search at any time prior to its conclusion." *Id.* at 36. Here, Ricardo was not given *Miranda* warnings, and the consent form presented to him contained none of these notices of Ricardo's rights. *See* Opp. Ex. B.

Accordingly, the Court should suppress the fruits of the search of Ricardo's apartment.

---

[3] The district court suppressed on the ground that the agents were required to inform the defendant that he had been indicted at the time he gave his consent. *Id.* at 36. The Second Circuit reversed this finding and remanded for the district court's determination of whether the defendant's consent had been voluntary under the Fourth Amendment. *Id.* at 41.

## II.

**Ricardo's Custodial Statements Following Interrogation Should Be Suppressed**

The Government has not carried its burden of establishing that Mr. Estrada-Tepal's purported *Miranda* waiver was executed voluntarily, knowingly and intelligently. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Notably, the Government admits that an agent may have asked Ricardo about "bin Laden" during the interrogation, but attempts to neutralize the coercive force of the reference by claiming the agent's intent was to "put Ricardo at ease." Opp. at 30. This defies logic and common sense. It is inconceivable how any comparison to "the most vile figure of the Third Millennium" would put anyone at ease. *Saleh v. Pretty Girl, Inc.*, No. 09 Civ. 1769 (ENV), 2012 WL 4511372, at *15 n.14 (E.D.N.Y. Sept. 28, 2012).

The Government fares no better with its assertion that Ricardo's full understanding of his *Miranda* rights can be inferred from his alleged failure to ask for further explanation of those rights and his answering of the agents' questions in detail. *See* Opp. at 29. These behaviors are also consistent with a lack of a full understanding of his rights by someone under the "inherently compelling pressures" of custodial interrogation. *Miranda,* 384 U.S. at 467. Moreover, the Government has not adequately addressed Ricardo's lack of formal education, a deficiency which the agents compounded by reading the waiver quickly and by interrupting Ricardo's execution of the form by introducing a supervisory agent into the interrogation who made a comment interpreted by Ricardo as a racial slur.

The Government cites *Toste v. Lopes*, 861 F.2d 782 (2d Cir. 1988), in support the proposition that a defendant's limited mental capacity alone is insufficient to invalidate a waiver. Opp. at 30 n.13. In *Toste*, the Second Circuit affirmed, "for the reasons stated" in the district court's decision, the lower court's denial of habeas relief. 861 F.2d at 783 (citing *Toste v. Lopes*,

7

701 F. Supp. 306 (D. Conn. 1987) (Cabranes, J.)). The district court had found the defendant's *Miranda* waiver valid based on the finding that the defendant "was familiar with police procedure," and on law enforcement witness testimony that the defendant operated "at about a sixth to seventh grade level" and was "streetwise." *Toste*, 701 F. Supp. at 313; *but see Toste*, 861 F.2d at 783 (Oakes, C.J., dissenting) (noting that law enforcement witness who opined on defendant's mental capacity was "the police officer who arrested him and took his statement"). Here, there is no indication – by the interrogating agents or otherwise – that Ricardo was "streetwise" or familiar with the police procedures in the United States, a country he had lived in for little more than two years.

Accordingly, Ricardo's statements in response to custodial interrogation should be suppressed.

**III.**

**THE SEX TRAFFICKING COUNTS MUST BE DISMISSED BECAUSE 18 U.S.C. § 1591 IS UNCONSTITUTIONALLY OVERBROAD**

Counts One, Three and Four of the Indictment should be dismissed because 18 U.S.C. § 1591 substantially infringes upon the right to free association guaranteed by the First Amendment.

The Government's primary argument in response – that "the First Amendment does not protect sex trafficking," Opp. at 32-35, does not respond to Ricardo's overbreadth challenge. Ultimately, the argument is also circular: section 1591 is unconstitutional precisely because its broad language plainly defines sex trafficking to include a substantial amount of constitutionally protected expressive and intimate association. The Government's reliance on *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), is misplaced. In *Arcara*, the Supreme Court considered

whether the First Amendment forbade enforcement of a New York statute "authorizing closure of a premises found to be used as a place for prostitution and lewdness" where the premises involved was a bookstore. *Id.* at 698. *Arcara* did not involve an overbreadth challenge; rather, the bookstore asserted that "a closure of the premises would impermissibly interfere with their First Amendment right to sell books on the premises." *Id.* at 700. The Supreme Court held the state statute constitutional as applied to the bookstore because the statute "was directed at unlawful conduct having nothing to do with books or other expressive activity." *Id.* at 707. Here, Ricardo argues that § 1591 is unconstitutionally overbroad because a "substantial number of its applications" involve constitutionally-protected activity, "judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010).

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), does not support the constitutionality of § 1591. In *Holder*, the Supreme Court considered the constitutionality of 18 U.S.C. § 2339B(a)(1) prohibiting "the provision of 'material support or resources' to certain foreign organizations that engage in terrorist activity." *Id.* at 7. The Supreme Court upheld the statute, but only after adopting a narrowing interpretation that excluded constitutionally-protected activity. Specifically, the Court adopted the Ninth Circuit's interpretation that "[t]he statute does not prohibit being a member of one of the designated groups or vigorously promoting and supporting the political goals of the group . . . . What [§ 2339B] prohibits is the act of giving material support." *Id.* at 39 (quoting 205 F.3d 1130, 1133 (9th Cir. 2000)). Here, in contrast, there can be no such narrowing interpretation because the plain language of § 1591 fails to include as an element any criminal purpose underlying its prohibitions or, indeed, any requirement that the prohibited conduct actually further sex trafficking. *See United States v. Robel*, 389 U.S. 258, 262 (1967) (holding unconstitutional provision of the Subversive Activities

9

Control Act of 1950 where "[t]he clarity and preciseness of the provision in question make it impossible to narrow its indiscriminately cast and overly broad scope without substantial rewriting") (internal citations and quotations omitted). Moreover, and contrary to the Government's assertion, the Supreme Court did not discriminate between the *Holder* plaintiffs' free speech and free association claims. *See id.* at 40 ("Any burden on plaintiffs' freedom of association in this regard is justified for the same reasons that we have denied plaintiffs' free speech challenge").

Similarly, the Government relies on inapposite case law when it responds directly to Ricardo's overbreadth challenge. *See* Opp. at 35-39. In *United States v. Williams*, 553 U.S. 285 (2008), the Supreme Court considered the constitutionality of a federal statute criminalizing pandering or solicitation of child pornography. In *Williams*, the Court focused on the categorical exclusion of child pornography from First Amendment protection: the statute was not overbroad because "offers to give or receive what it is unlawful to possess have no social value and thus, like obscenity, enjoy no First Amendment protection. . . ." *Id.* at 298-99 (holding that "offers to provide or requests to obtain child pornography are categorically excluded from the First Amendment"). Here, there is no corresponding categorical exclusion from the First Amendment of the types of intimate and expressive association prohibited by the plain language of § 1591. *See* Ricardo Mot. at 21-22.

In *Adams v. Zelotes*, 606 F.3d 34 (2d Cir. 2010) (per curiam), the Second Circuit upheld against constitutional challenge a section of the Bankruptcy Code prohibiting debt relief agencies from providing certain advice to consumer debtors. However, the Circuit relied primarily on an intervening Supreme Court decision that had imposed a narrowing interpretation of the statute in question. *See id.* at 36-37 (citing *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S.

10

229 (2010)) (noting that *Milavetz* "rejected a broad reading of the provision").[4]  As noted, here the plain language § 1591 prevents such a narrowing interpretation.

*Virginia v. Hicks*, 539 U.S. 113, 124 (2003), involved the constitutionality of a Virginia Housing Authority's public housing trespass policy. The Supreme Court reversed the Virginia Supreme Court's holding that the policy was unconstitutional because the policy applied to "all persons" entering the area, "not just to those who seek to engage in expression." *Id.* at 123. Thus the policy was not overbroad because the vast potential applications far outnumbered the unconstitutional applications. *Id.* ("The rules apply to strollers, loiterers, drug dealers, roller skaters, bird watchers, soccer players, and others not engaged in constitutionally protected conduct—a group that would seemingly far outnumber First Amendment speakers").

In contrast, here § 1591 does not apply to everyone entering a certain geographical area, but to those who recruit, entice, harbor, transport, provide, obtain, or maintain by any means a person who the defendant knows will engage in underage or coerced commercial sex.  In addition to those committing the proscribed actions with the intent of furthering sex trafficking, this broad language plainly applies to those seeking to exercise associational freedoms, both intimate and expressive, protected by the First Amendment. *See* Ricardo Mot. 21-24. Unlike *Hicks*, here the latter group – those with family and other intimate connections to victims of sex trafficking, as well as organizations and individuals seeking to aid victims for expressive purposes – while substantial in relation to the former, does not include a large number of "others not engaged in constitutionally protected conduct."[5]

---

[4] Moreover, the Second Circuit expressed uncertainty as to whether the district court's decision "constituted a facial or as-applied holding." *Id*. at 37-38.

[5] The Government's reliance on *Hicks*' statement that an overbreadth challenge will "rarely" succeed where the law at issue "is not specifically addressed to speech or to conduct necessarily

Finally, the threat that § 1591 will chill the exercise of First Amendment freedoms is not "imagined," as the Government contends, but quite realistic. The prospect of a family member, close friend or victims' rights advocate knowingly providing assistance to a forced or underage sex worker is far more plausible than nude public performances, political debates, and John Grisham readings posited in *J&B Entm't, Inc. v. City of Jackson*, 152 F.3d 362, 366 (5th Cir. 1998).[6]

Accordingly, 18 U.S.C. § 1591 is unconstitutionally overbroad and, as a result, Counts One, Three and Four of the Indictment must be dismissed against Ricardo.

---

associated with speech," 539 U.S. at 124 (dictum), does not help its argument. The Government offers no explanation as to why intimate and, particularly, expressive associations are more akin to "conduct" than to "speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Id*.

[6] In addition, in *J&B Entm't* the plaintiff "conceded that the City removed much, though not all, of the possible overbreadth through the exception's exemption of persons 'engaged in expressing a matter of serious literary, artistic, scientific or political value.'" *Id.* at 366. Because § 1591 has not (and, indeed, cannot) be given such a narrowing interpretation, Ricardo makes no such concession.

## CONCLUSION

For the foregoing reasons, the Court should suppress any fruits of the search of Ricardo Estrada-Tepal's residence at 104-47 38th Avenue in Queens, New York, and any statement made by him in response to custodial interrogation. In the alternative, the Court should hold an evidentiary hearing to determine the validity of any purported consent to search or waiver of *Miranda* rights. Finally, the Court should dismiss Counts One, Three and Four of the Indictment because 18 U.S.C. § 1591 is substantially overbroad.

Dated:   New York, New York
         July 26, 2014

By:_____s/_____
Matthew B. Keller
Of Counsel
Peter R. Ginsberg Law LLC
80 Pine Street, 33rd Floor
New York, N.Y. 10005
(646) 374 – 0026
mkeller@prglaw.com
*Attorney for Defendant*
*Ricardo Estrada-Tepal*